UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                  CASE NUMBER: 04-80335-03
                                            HONORABLE VICTORIA A. ROBERTS

v.

CURTIS ELLISON,

        Defendant.
_____/

## ORDER

**I.    INTRODUCTION**

In his Sentencing Memorandum, Defendant objects to the Presentence Investigation Report ("PSIR") and challenges the Probation Department's calculation of his base offense level to the charge of Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) and (h). Pursuant to the Sentencing Guidelines, § 2B1.1(b)(1)(E), Probation determined that the amount of laundered funds was more than $70,000, but less than $120,000; and, therefore, added eight levels to Defendant's base offense level. With this addition, Defendant's base offense level became 16. Defendant asserts that he laundered approximately $9,700, the amount he invested in cars.

**II.    BACKGROUND**

By way of background, Defendant originally pled under a Rule 11 Plea Agreement. The First Superceding Indictment charges Defendant and others with

1

Conspiracy to Distribute Marijuana (Count I).  Defendant is also charged with conspiracy to Launder Monetary Instruments (Counts Five and Six) and Forfeiture (Count Seven).  On July 11, 2006, Defendant pled guilty to Count Six only.  As part of the factual basis for the plea, Defendant testified that in an effort to launder money from the sale of illegal drugs, he leased cars from a broker on behalf of himself and others.  When asked "Do you know how much money was involved in your leasing of cars," Defendant responded:

> I don't know the exact number, Your Honor.
> the value of the car was $70,000.  The cars
> were valued at more  than $70,000.  (Tr. 19).

This was the only testimony pertaining to value.   The Rule 11 Worksheet A states that the money laundering conspiracy involved "more than $70,000."  The Probation Department relied upon Defendant's colloquy and the Rule 11 to calculate Defendant's base offense level.

This is important because at the outset of the evidentiary hearing held on January 19, 2007, Defendant stated that no one ever calculated the amount spent on drugs to establish the amount of laundered funds.  And, he never admitted involvement in a drug conspiracy.  While this is true, the amount spent on drugs was never relied upon because Defendant pled to the greater than $70,000 amount, and he linked it all to leased cars.  Hence, there was no reason for the Probation Department to rely on anything beyond Defendant's admission.

The indictment, however, contains laundering allegations that are broader than money spent on cars, and it placed Defendant on notice that the Government alleged

that the money laundering conspiracy was partially conducted by Defendant and others by taking "the proceeds from the sale of marijuana . . . and . . . utiliz[ing] these proceeds to purchase further quantities of marijuana . . .." Count Six, First Superceding Indictment. Further, the Indictment charges in Count Six that Defendant and his co-conspirators knew that laundered funds "were the proceeds of and were intended to promote the distribution of controlled substances." Thus, the value of funds laundered through the promotion of drug activity that is attributable to Defendant in the Indictment is more than $70,000. The Court finds Defendant was certainly on notice concerning the Government's allegations of laundering.

In his Objections to the PSIR, Defendant challenges the $70,000 calculation. He testified that he only spent $9,700 on automobiles; that the value of the cars cannot be used as a basis for calculating the amount laundered; that he does not take responsibility for having paid more than $70,000 for automobiles, or, for aiding or abetting anyone in paying that amount.

These Objections were followed by a Sentencing Memorandum raising the same objections, among other things. In light of these filings, the Government filed a *Combined Motion and Brief for Withdrawal From Rule 11 Plea Agreement* (Dkt. 234). The Rule 11 stipulated that neither party may take a position concerning the applicable guidelines that is different than any position of that party as reflected on the worksheets attached to the Rule 11. The Defendant agrees that he is taking a position contrary to the one agreed upon in the Rule 11 Agreement. Given this, the Court **GRANTS** the Government's motion.

Defendant, however, does not seek to withdraw his plea. Instead, the parties

agree that the Defendant can continue to plead guilty to Count Six only of the Indictment; the Government will dismiss Counts One, Five and Seven.

Further, the parties agreed that the Court will decide the base offense level, utilizing a preponderance of the evidence standard. An evidentiary hearing was held on January 19, 2007.[1] At the evidentiary hearing, the Government conceded that the value of the automobiles could not be used to determine the amount of funds laundered for purposes of establishing the appropriate sentencing guideline (Tr. 212).

Before any testimony was heard, Defendant argued that the Court could not rely on funds spent to buy drugs to establish the amount of money laundered–because the character of the proceeds would not have changed into something legal. At the conclusion of the hearing, the Court stated to counsel that the Government's theory - that money laundering encompasses drug proceeds used to purchase other drugs and to promote unlawful activity - is supported by case law. *See United States v. King,* 169 F.3d 1035 (6th Cir. 1999)(upholding a money laundering conviction where defendant wired funds to couriers as payment for marijuana). Defendant–although given the opportunity - did not argue otherwise.

So, given that laundered money includes drug money used to buy drugs, and that the Government conceded the value of the cars cannot be used to determine the amount of funds laundered, the only issue before the Court is whether a preponderance

---

[1] At the onset of the evidentiary hearing, Defendant acknowledged that there were other issues in dispute. Specifically, the Government's allegations of drug dealing and the Probation Department's inclusion of a misdemeanor conviction for domestic abuse in the PSIR. However, Defendant stated that he only intended to present evidence relating to the money laundering and the calculation of his base offense level.

of the evidence supports a conclusion that Defendant spent in excess of $70,000 to either: (1) lease automobiles; (2) buy drugs; and/or (3) otherwise promote a drug conspiracy.

### III. FINDINGS OF FACTS AND CONCLUSIONS OF LAW

#### A. EVIDENCE THAT DEFENDANT USED DRUG PROCEEDS TO LEASE AUTOMOBILES.

The parties stipulated that during the course of the conspiracy, Defendant leased three cars for himself: a 2001 Range Rover, a 2002 Mercedes Benz S-500 ("Mercedes"), and a 2002 GMC Yukon, Denali ("Yukon").

The Court concludes that the evidence was insufficient to support a conclusion that the Defendant spent in excess of $70,000 on automobiles. However, the evidence does establish $50,000 in payments by Defendant, either on behalf of himself or others.

Annette Matthews, the wife of Emery Matthews, testified that Defendant leased cars from her husband who ran an automobile leasing company. Mr. Matthews testified that most of his customers were drug dealers. ( Tr. 127). Mrs. Matthews testified that she served as bookkeeper to the company. She testified that her husband's customers typically made their monthly payments in cash. (Tr. 59). While Mrs. Matthews did not recall Defendant ever making payments on behalf of anyone else, Defendant admitted at his plea hearing that he did lease automobiles in his name, but for other people. Mrs. Matthews testified that Defendant directly made between $8,000-$10,000 in lease payments to her.

She also testified to one occasion when Defendant came to the leasing company after business hours and demanded a car, stating that he had paid her husband

$50,000, but Mr. Matthews had simply taken Defendant's money and ran off. (Tr. 88, 117). Mrs. Matthews said that Defendant, accompanied by co-Defendant "Face" (Reginald Dancy) and two others, threatened her and her daughter. In response to the threats, she gave Defendant a Yukon.

Mr. Matthews testified to the same threatening scene. He, too, testified that Defendant appeared with others and demanded $50,000 or a car. Mr. Matthews was questioned:

| | |
|---|---|
| The Court: | Was he saying to you that he had given you $50,000 over a period of time? |
| The Witness: | Yes. |
| The Court: | Was that accurate? |
| The Witness: | Yeah, it was about right. With payments and the down payments and all that, I never got 50 at one time, you know. Just with the down payment of the Range Rover, down payment of the Mercedes Benz, couple of notes here and there you know, basically was it. (Tr. 144). |

When Mr. Matthews was asked about specific payments, he could only recall that Defendant made a $15,000 down payment on the Range Rover; about three monthly payments on the Range Rover totaling $3,600 (Tr. 130); a $10,000 down payment on the Mercedes (Tr. 131); and a couple of monthly payments totaling $2,600 (Tr. 132). Thus, Mr. Matthews specific testimony and memory only establishes that Defendant paid a total of $31,200.

Defendant testified on his own behalf. Foremost, he denied ever being involved

6

in his co-defendants' drug sales. (Tr. 176) Further, he denied ever paying or stating to the Matthews that he had paid $50,000 for cars. He testified that he made only one $1,200 payment on the Range Rover (Tr. 181) after making an $8,500 down payment (Tr. 184). Shortly thereafter, he got shot and returned the Ranger Rover to Mr. Matthews because he could not continue to make payments. Mr. Matthews agreed to sell the Range Rover and return a portion of the down payment to Defendant. However, Mr. Matthews sold the Ranger Rover but never returned the money. In exchange, he later provided Defendant a Mercedes for no down payment. (Tr. 184). Defendant testified that before he made any payments on the Mercedes, Matthews took it back because the named owner wanted it removed from her name and returned (Tr. 185). As a result, Matthews gave Defendant a Yukon. Defendant he was arrested soon after. Defendant admitted to a total of $9,700 in payments.

Defendant also testified that he bred and sold pedigree dogs for income, receiving approximately $750 to $1,000 for puppies and $5,000 to $15,000 for adult dogs. (Tr. 178). Defendant admitted that he did not report this income and believed most of his customers paid with drug proceeds. (Tr. 179).

It is from these facts that the Court must determine the amount laundered through the leasing of cars. In weighing the evidence presented by the witnesses, the Court notes that Mr. and Mrs. Matthews have extensive criminal records involving crimes of dishonesty.[2] The Court may consider a witnesses' previous conviction of a

---

[2]Defendant has numerous convictions, including one for receiving and concealing stolen property. Although Michigan courts have not consistently decided whether this a crime of dishonesty or solely a crime of theft, the courts do acknowledge that the crime does entail an element of dishonesty. *See People v. Cal*, No. 245500, 2004 WL

crime involving dishonesty or false statement when weighing the credibility of that witness. A witness's testimony, however, is not wholly discredited because he previously committed a crime of dishonesty. *See Welch v. Tennessee Valley Authority*, 108 F.2d 95 (6th Cir. 1939)("The trial court, when sitting without a jury, may consider the witnesses' sources of knowledge, their interest, good intentions, their seeming honesty, their respective opportunities for personal knowledge of the facts about which they testify and their conduct and manner on the witness stand.").

Bearing this in mind, the Court does credit Defendant's admission to both Mr. and Mrs. Matthews that he paid $50,000 for automobiles. He also admitted during his plea that the money he used to lease cars came from drug sales. (Tr. 19). This large sum of money apparently provoked Defendant to appear at the leasing company after hours and threaten to violently harm Mrs. Matthews and her daughter if he was not immediately paid or furnished with a car. While Defendant may not have made all of these payments on behalf of himself, his own plea testimony established that he leased cars in his name for other people.

### B. EVIDENCE THAT DEFENDANT USED DRUG PROCEEDS TO PROMOTE AND CARRY ON DRUG ACTIVITY

The Court finds that the evidence is sufficient to support a conclusion that Defendant used drug proceeds to, minimally, buy more drugs.

The Government indicted Defendant and he pled guilty to conspiracy to launder money under 18 U.S.C. § 1956(a)(1)(A)(I); the "promotion prong." This requires the

---

895961, at *5 (Mich.App. April 27, 2004); *but see People v. Martin*, No. 253797, 2005 WL 1160647 (Mich.App. May 17, 2005).

Government to prove that Defendant conspired to conduct a financial transaction which involved the proceeds of unlawful activity, with knowledge that the money was the proceeds of unlawful activity, and with the intent to *promote* the underlying criminal activity. *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996). Although § 1956(a)(1)(A)(I) requires proof that the illegal proceeds were spent in furtherance of the drug conspiracy, "it does not require that the Government 'trace the money [spent in furtherance of the illegal drug trafficking] to a particular illegal drug transaction.'" *United States v. Livingston*, 256 F.3d 231, 249 (4th Cir. 2001).

Courts have consistently held that payment for drugs or using drug proceeds to buy more drugs "promotes" the ongoing drug conspiracy. *See, e.g., United States v. Baez*, 87 F.3d 805, 810-11 (6th Cir. 1996)(upholding defendant's money laundering conviction under "promotion" prong of the statute for sending a courier to pick up drug proceeds in one state and deliver them in another); *see also United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991)(upholding defendant's conviction for "promotion" money laundering where defendant wrote checks for beepers and gave them to drug couriers to facilitate additional drug transactions).

Defendant admitted during his plea colloquy that the money he used to lease cars came from the sale of illegal drugs. (Tr. 19). Interestingly, he denies, however, that he, himself, ever engaged in the sale of illegal drugs or participated in a drug conspiracy. At the hearing, evidence was presented to the contrary. Jimmy Grey ("Grey"), with a long history of drug dealing, testified that he had extensive dealings with co-defendant Eric Woodley. In fact, Grey was arrested in 2002 while driving a truckload of marijuana for Woodley. As a worker for Woodley between 2000 and 2002, Grey

witnessed Woodley dealing in marijuana, cocaine, and heroine. With respect to the marijuana, Grey testified that Woodley dealt in "truck loads" - hundreds of pounds -- which he purchased in Arizona for shipment to metropolitan Detroit. (Tr. 36). During that time period, Grey testified that the street value of the marijuana was $1,100 per pound. (Tr. 37)

In addition, Grey testified that Woodley owned a house on Stahelin Street ("Stahelin") in Detroit, Michigan, out of which marijuana was sold and where many people hung out. Grey testified that Defendant did not hang out there, but just "came by." (Tr. 40). Grey further testified that on one occasion, Defendant came by with what Woodley told Grey was a bag containing $20,000 to pay an individual named "DaDa" for heroine, but that "DaDa" would not take it – because "DaDa" kept "fronting" Defendant heroin. (Tr. 41). Grey recalls this incident occurring between 1999 and 2000.

Grey also testified that when large shipments of marijuana would arrive at Stahelin, Defendant would come over and "get pounds of weed." (Tr. 45). He observed this twice, around 2001 and 2002. (Tr. 46). He testified that Defendant would get approximately 20 pounds. He further testified to conversations between Woodley and Defendant concerning money owed Woodley by Defendant for the marijuana. When he testified in front of the Grand Jury, Grey recounted Defendant's receipt of marijuana and involvement in drug transactions with Woodley. (Tr. 70-71)

Therefore, if the Court credits Defendant with having picked up only one shipment of 20 pounds, assuming it had a street value of $1,100 per pound, this marijuana had a value of $22,000.

Despite Defendant's denials, the Court finds the evidence presented is sufficient

to establish that Woodley fronted marijuana to Defendant in large enough quantities to conclude that Defendant was not buying it for private consumption; that he sold marijuana and that drug proceeds from the conspiracy charged in Count One of the Indictment were reinvested into the drug operation, thereby promoting ongoing unlawful activity.

Further, it is clear from the PSIR that Defendant had insufficient legitimate income to produce the money used in the transactions, even assuming he obtained income from his dog selling business. *See, e.g., United States v. Puig-Infante*, 19 F.3d 929, 940 (5th Cir. 1994)("Although proof of [a defendant's] limited income, by itself, is insufficient for a money-laundering conviction under section 1956, evidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when a defendant claims income from additional sources."); *see also United States v. Hardwell*, 80 F.3d 1471, 1483 ("Evidence that a defendant was engaged in drug trafficking and had insufficient legitimate income to produce the money used in a transactions is sufficient to establish that the money was derived from proceeds of drug distribution.").

Crediting all of Grey's testimony, which the Court would be entitled to do viewing the evidence in the light most favorable to the Government, would push the amount Defendant laundered through drug purchases at $64,000.

**IV. CONCLUSION**

The $22,000[3], combined with the $50,000 that Defendant admitted he paid for

---

[3]This figure is derived by multiplying the 20 pounds of marijuana by the approximate street value, which testimony revealed to be $1,100 per pound.

cars, is sufficient to support the application of 2S1.1(a)(2) and to assess an additional eight points in the calculation of Defendant's base offense level.

**IT IS SO ORDERED**.

                                                  s/Victoria A. Roberts
                                                  Victoria A. Roberts
                                                  United States District Judge

Dated:  January 31, 2007

---

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 31, 2007.

s/Linda Vertriest
Deputy Clerk

---